I'd like to start by apologizing for a citation of supplemental authorities I submitted this morning. Maybe you should say your name. Oh, I'm sorry. My name is Eitan Kaslyanich. I'm representing Leroy Lindquist. I submitted a supplemental authority this morning. I brought copies of it in case you didn't have it yet, and it's just the cases you know about. No, no, no, don't, don't, don't. Just leave them there with the clerk. Okay. Lindquist has been through a lot since 1996. He's had two back surgeries back in 1998 and 1999. So he's on disability right now. He is on disability. So we're talking about, what, 20 months here, something like that? Yes, precisely. We're talking about December 2008 through September 2010. And what's, one of the interesting things about this case is that some of the ALJ's findings, although that's the only time period that was at issue, even though he hasn't worked since 1996, he only was alleging disability since 2008 because he actually applied for disability benefits back in, I think, 2000, 2001. This isn't in the record. He was turned down. He thought, well, I'd rather work. He went, tried to go back to school. He was attending college. And then he got renal cancer. Had to have a kidney removed. He had a lot of problems. He had a lot of problems. No two ways about that. Was there, the ALJ discounted his credibility, though, right? That's correct. And so my question would be, and the things that the ALJ seemed to point to, it's not limited to this, but his scuba diving and recent travels to Hawaii and Mexico, his conservative course of treatment for his back from 1999 until seven to eight years later. So why aren't those appropriate grounds for discounting the credibility of his testimony? Let me start with the second one. The record is incomplete prior to 2008. If they'd gotten all the records, we'd have a file that was thousands of pages thick. But they didn't, because they didn't have to, because he was only alleging disability since 2008. The ALJ can't very well find him not credible based on lack of treatment during a time period in which the ALJ had no treatment records and didn't review any. So that's not a valid reason. Now, back to the scuba diving. That's an unusual situation. But it's explained in his testimony. He doesn't, he cannot scuba dive by himself. He cannot lift any of the equipment. He cannot carry any of the equipment. He's only able to go with scuba buddies. He explained it in his hearing testimony. They would take all the equipment down there. It's still a pretty vigorous activity. Even if you're in the water and have got the buoyancy of the water to help support the tanks, scuba diving is a vigorous activity. It's not for the faint-hearted. I have never scuba dove. Have you? Anyone else? Okay. And so, interestingly, the ALJ here was a scuba diver. And so he was approaching it from his knowledge of, and I don't, I can't debate that issue or, you know, with anyone here. But what I can point to is his explanations of when he was in the water, that's when his back felt the best. He'd been through two back surgeries. They were failed surgeries. He's scuba diving not only in the sound, which would be relatively calm water, but his scuba diving was in Mexico and Hawaii. So that's ocean-based. Once again, I cannot, I don't think it's within the court's purview or even an ALJ's purview to look at. For one thing, nobody asked him. So tell us what the surf conditions are when you were doing it. How many people helped you? I assume he's coming in and out of a boat rather than maybe exiting surf. But even if you're doing that, there's still quite a bit of physical activity getting in and out of a boat and manipulating equipment, even if somebody's helping you with the weight of the equipment. I can't argue with that. I mean, this is, I know the equipment's heavy just from seeing people lug it. And given that he's been doing this extensively at 20 to 30 dives, then what's wrong with the ALJ's finding? First of all, most of those dives were prior to 2008. There's no discrimination on that in the ALJ's analysis. Second of all, the problem with the ALJ's analysis is if you look in his decision, and that's what we have to be reviewing here. The ALJ never mentions the dive buddies, doesn't discuss it, never acknowledges it, and yet he rejects both his testimony about his credibility based on the fact that he was doing this thing while not looking at the whole picture. He also rejected Dr. Schneider's opinion, the consulting psychiatrist, in part because she said she detected, she observed, clinically observed problems with his concentration. And the judge said, well, there's no problems with his concentration because he's scuba diving. Well, did the report of Dr. Clifford, the non-examining psychologist, conflict with the report of Dr. Schneider, the examining psychologist? To some extent it did. It's actually a, but the ALJ said he was giving significant weight to Dr. Clifford's opinion and then didn't include the limitation, and it's a poorly worded limitation, about an inability to handle fast-paced work, I believe it was. And here we go. Under time pressure. Dr. Schneider signed once, is that right? That is correct. And from that she concluded that he has problems with concentration. That's correct. And the problem with the ALJ's rejection of Dr. Schneider's opinion is the ALJ never mentions any of her clinical findings. He says, well, I'm going to reject her opinion because her opinion is not supported by clinical findings, but he didn't mention them. And the clinical findings, there were many clinical findings that, not just about concentration, but he was in tears. I mean, he was not, you know, when you're an examining psychiatrist is qualified to figure stuff out when they talk to someone, they make their observations. It's a lot of conclusions for a one-time visit, though. Well, this is the nature of the Completely? Yeah, essentially, yes. Because all those limitations, yes, I will say completely, because he didn't use any of those limitations in his residual functional capacity assessment. And with regard to her findings, there were so, I mean, sometimes you'll only have one word. You'll have blunt affect. And that's all you got, because they don't report, they don't record their findings. Then they say, oh, there's all sorts of problems. And at least there's some kind of finding. Here, there were piles of findings. He needed to have questions repeated. He lost track of questions. His responses were frequently tangential. Mental activity was notable for circumstantiality, tangentiality, verbosity. He appeared anxious. He was somewhat labile. Was Schneider aware of his scuba diving? No. I don't think he was doing it very often at that point. I mean, I know he had done it prior to the hearing, but. Well, I guess she does. She says he's getting training in diving. Okay. But, you know, once again, she was basing her. She can't base her opinion. It wouldn't be proper for her to base her opinion on what he tells her, for the most part. I mean, she's got to look at him, talk to him, and see what are my impressions, my clinical findings, based on this 45 minutes to an hour of sitting here with you and asking you, how's your life? And he starts crying. So, you know, she had a basis for her opinion, and he didn't give any legitimate reasons for rejecting her opinion. Well, I think the ALJ asserted certain rationales for either dismissing or disregarding Dr. Schneider's opinion, including but not limited to Lindquist's decision not to seek treatment from a psychiatrist from 1999 until September of 2009, Lindquist's attendance of community college up until 2006, and evidence that drugs controlled Lindquist's symptoms. So why aren't those appropriate grounds? Let's start with the 2000. Attending college up through 2006 when he was diagnosed with renal cancer and had to drop out of college, had to have a kidney removed, and had a pulmonary lesion that has to be checked back every year. He never recovered from that. And then in 2008 is when Dr. Schneider saw him. There's no way that you can reject Dr. Schneider's current clinical findings about his concentration problems in 2008, or excuse me, January 2009, based on the fact that he was able to go to college in 2006. He's not claiming that his concentration prevented him from going to college back then. He was able to. He was doing it. He was doing the best he could. You also argue that the ALJ failed to address several of Lindquist's diagnosed conditions at Step 2 of the analysis, but the ALJ did address these conditions at the residual function capacity step. And I'm looking at Lewis v. Astru, which seems to say there's sort of a choice of structure in how ALJs can do things, and it's not necessarily reversible error. We don't have a Step 2 objection to his analysis. I mean, he missed a bunch of stuff. He got a bunch of stuff wrong at Step 2. But because he went beyond Step 2, it's not harmful error. He proceeded through all of the steps. The problem was at Step 3.5, right before Step 4 when he did the residual functional capacity assessment, he did not include the problems from his shoulder. He did not include the problems that Dr. Schneider had described involving his inability to handle stress. And most significantly, he did not include any of Lindquist's description of his limitations in his ability to sit, stand, walk, his need to lie down on the floor to relieve pain. That's not because he discredited Lindquist. That's correct. And he gave no weight to? He gave no weight to anything he said. Well, and he gave no weight to what Schneider said. That's correct. And those were the two big mistakes here. So what are you asking for? I'm asking this Court to find that the ALJ, that none of the ALJ's reasons, either choose two choices. First of all, none of the, in my opinion, none of the ALJ's reasons for rejecting Lindquist's testimony are convincing. Well, they have to be supported by substantial evidence. Pardon me? So they're not supported by substantial evidence. They're, the only one that is, begins to be supported by substantial evidence is the diving one. And the problem with that is the ALJ didn't take the dive buddies issue into account, or the rarity in which he was doing this into account. So, but there are so many other reasons, all of which were clearly improper, such as rejecting his testimony about concentration problems based on his ability to go to college two years before he became disabled. Two years before his, and I want to say this, there's an issue that the government raises about we never amended, his amended, alleged onset date was never amended formally to the date of the application. But the ALJ announced it as a decision, I'm only considering from the date of the application, because that's all you can have under SSI. And Lindquist had been disabled since 1996, but there's no evidence in the file, because it's not an issue. So evidence from prior to 2008 here, because it's so. Roberts. There's one other issue, and that's that the ALJ, I believe, didn't accept the, or rejected the testimony or the declaration of Lindquist's buddy. Well, that's, excuse me, that's the other issue, his friend. Ms. Radcliffe gave a detailed description of the many problems she'd observed. This is independent observations, which confirmed that he really was as dysfunctional as he claimed to be. His dysfunction is also confirmed by his treating physicians, who never stated an opinion about functional limitations, but they confirmed that he was complaining about the pain was recurring. He was having pain from his back, into his leg, down to his heel. And there's no question about that he's got a legitimate, he had these two back surgeries. He had a reason why he was experiencing this pain. Yet he was called a flat-out liar. Nothing he says is true. His, he takes baths every morning. He has to do ice and heat his back constantly. It doesn't mean that everything he said wasn't true. It just says that as to critical things, you didn't find him credible. None of his testimony was accepted. None of his limitations were accepted. So it's like calling him, it's like rejecting all. Do you want to stay the rest of your time? I would like to.   Thank you. May it please the Court, Jordan Goddard for the Commissioner of Social Security. Good morning. Mr. Lindquist obviously has a number of problems, and they progressed over time. The Commissioner found Mr. Lindquist disabled about six months after this decision was made. And that corresponds exactly with the first time that one of his treating physicians actually endorsed his disability application. Dr. Lee, those records were submitted to the Appeals Council after the ALJ's decision. And according to this circuit, they are taken into consideration when evaluating the ALJ's decision for substantial evidence, regardless of whether the ALJ was actually involved. That event occurred after the ALJ's hearing, right? Exactly. Dr. Lee only opines about when he saw him at that time, which was after the hearing. Exactly. When asked if he would speculate back as to, he said no. He would not speculate the limitations back. That doesn't really help anybody on this record. Well, I don't know that I would agree with that. I mean, this is the first time we've seen any treating doctor, even though Mr. Lindquist had apparently good access to medical care, this is the first time we see any of his treating doctors endorse a disability application, even though, as Mr. Lindquist's attorney pointed out, this is neither the first nor the last of his disability applications. We found him disabled the first time one of his doctors actually opined that he was disabled. However, getting back to some of the- it's sort of like I'm sick, I'm sick, I'm sick, and then finally someone says, oh, you really are sick, and then you go back and say, I told you I was sick. But then what you're saying is at some point he crossed the line, and when he crossed the line, that's when he became disabled. But he's got a lot of problems here. He does, and I would just distinguish the facts of this case from the example you gave, Judge Callahan, because a notable development is that Dr. Lee actually put him on morphine, on regular narcotic pain medication for the first time here since his surgeries back in 1999. And so there actually wasn't- it wasn't just a matter of a doctor probably saying, okay, there was actually a notable change in the course of his treatment by his treatment providers when this opinion was given. And it goes directly to the rationale that the ALJ gave in this case about the conservative course of treatment. And I think it's a good comparator. You can see what the ALJ is envisioning when he talks about a less conservative course of treatment. The kinds of signs that the ALJ has not seen in the medical record before him are, in fact, the kind of signs that we expect to see and are present in the updated medical records that are submitted. Increased medication, and specifically narcotic medication being used, whereas it was not being used at the time of the period. Is he still scuba diving? Excuse me? Is he still scuba diving? Well, as of right now, I don't know. But at the hearing he indicated that only about two months before the hearing he had gone before, I believe he indicated about ten dives since he filed his application for disability benefits in 2008. So he seems to be going on a semi-regular basis. I assume that now that he's on disability and taking the more serious — How does that undermine his credibility? The diving? Yes. Well, he is — one of the bases of disability that he's claiming is a severe back pain. And the ALJ, I think, was reasonable in inferring that someone with the severity of back pain, as well as the concentration and fatigue issues he says he has, wouldn't be engaging in this type of activity, a, frankly — Even if you go with dive buddies and all that? Even with dive buddies. I mean, you can have dive buddies all around you. It doesn't make it a safe activity if you are — if you have impaired concentration, if you are physically unable to, you know, move and do what you have to do. Dive buddies can only do so much. You're still taking your life in your hands if you're going diving when you have debilitating, what you claim to be debilitating impairments. And it was reasonable for the ALJ to say, I don't think that this person would be engaging in a recreational activity on a regular basis that puts his life in danger and requires him to lift 50 to 100 pounds. Now, the ALJ recognized that he can't regularly lift 50 to 100 pounds. The ALJ found him limited to light exertion work, which requires no more than 20 pounds. So he did credit that there was a back problem, that there was back pain. But the ALJ reasonably said — reasonably found that if you're voluntarily engaging in a recreational activity on a semi-regular basis that requires you to lift quite a bit of weight, that requires you to maintain focus and attention or else you endanger your life, it goes against your credibility. In fact, there's very interesting testimony you'll find in pages 72 through 78 of the record, where at the hearing, Mr. Lindquist actually kind of brags about how difficult it is scuba diving here in the Puget Sound. As was noted earlier, he has gone to — he's done some ocean diving out in Hawaii and Mexico, which can be more challenging, but when the ALJ asked about his local diving here, he started talking about how there's no visibility. You have to know about tides and currents and it's tricky stuff, which really belies his testimony that he's got these concentration issues, that he's prone to these bouts of sudden fatigue where he just can't do anything anymore. If that were the case, it's really strange that he would be going out there and choosing to engage in this activity shortly before his hearing. Well, does he — the ALJ calls his activity vigorous, I think, or something? He does, and there are more activities here than just the diving. That's the most notable one. He also testified, and the ALJ noted this, that he paid for room and board, and has paid for room and board since 2000 by doing household chores. And the record indicates those household chores included things like trimming the trees in his roommate's lawn and cutting the lawn with a lawnmower. In fact, not long — he was scheduled for surgery right after the hearing because he had injured his shoulder while trying to start the lawnmower. But didn't he testify that his son was helping him or somebody was helping him? Yeah, there was something about his son helping him with some of the yard work. However, again, there actually — there's an emergency room record from 2007 where he fell off a ladder, he said, while trimming the trees in the backyard. And there was no mention of the son doing anything. He was definitely up on the ladder. So why did the ALJ — I think your appellant's counsel said that the ALJ disregarded Ms. Radcliffe's lay testimony. Did the ALJ legitimately do that from your perspective, or what did the ALJ have to do? The ALJ — well, when evaluating lay witness testimony, this court has said that the ALJ only need give germane reason, a very, very low standard to meet. Here the ALJ noted the inconsistency with daily activities. The most blatant inconsistency is the fact that one of the claims that Ms. Radcliffe made was that we can do no traveling at all because of his back impairment. This was three months after they got back from Hawaii. So I think that just on its face, it's a very incredible statement. She describes limitations that are really hard to reconcile with his actual activities during that period, most notably just the blatant inconsistency with the travel. And the ALJ actually asked Mr. Lindquist about that flight to Hawaii and asked him what airline he took and made sure that he basically got him to talk about it a little bit. And Mr. Lindquist didn't mention anything about, well, it's difficult on a plane because if I have to change positions every 15 minutes, as I'm claiming, in 2006 the air marshals don't like you doing that, but nothing like that. No indication of problems. No indications of problems on the earlier trip to Mexico either. He seems to be, as ALJ says, living a rather vigorous lifestyle, doing household chores and taking semi-regular vacations and going on scuba dives. How about Schneider's opinion? Regarding Schneider's opinion. Did ALJ completely discredit that opinion? No, Your Honor. Did he give it any weight, and if so, what kind of weight did he give it? Well, he gave it some weight, and he only rejected two specific aspects, Dr. Schneider's opinion regarding attendance and Dr. Schneider's opinion regarding ability to maintain concentration throughout a workday. The ALJ was very specific in what he was rejecting here. And both of those are well supported. If we start with the concentration one, the ALJ notes that Dr. Schneider's own testing on concentration doesn't support her opinion. She does concentration mental status testing, and the results are quite good. When she evaluates concentration, it looks like what she's doing is simply crediting his statement that I have difficulty concentrating. But her own test results didn't show that. And the case law says that that is a valid reason, especially when you have this one-time evaluation where the doctor didn't have any prior medical records to evaluate. She's basically just going on. Is there a reason the ALJ gave for discrediting that particular? Well, the ALJ, I mean, the ALJ actually gave the very lengthy discussion of Dr. Schneider. Did he give that particular reason? The ALJ, I believe, noted that it was a one-time evaluation. But did he give that her opinion was inconsistent with the test? Oh, yes. Yes, it was inconsistent with her own test results. Absolutely. Where is that in the ALJ's opinion? Okay. On page 24, the last paragraph, beginning, it's towards the bottom of the paragraph, however, the undersigned finds that the objective evidence and clinical findings fail to support the conclusion that the claimant would not be able to maintain concentration or regular attendance in the workplace. I admit there could have been a more specific citation here,  He's talking about Schneider? Yes. This is specifically in the ALJ's discussion of Schneider. Rejects the concentration findings because of the inconsistency with the objective testing. And Schneider puts the objective test results in her report, and there is no deficit in concentration found. It's a little difficult to follow the ALJ's opinion when he doesn't refer to any of the doctors by name. I agree. Not a practice we usually see in ALJ opinions. I agree. I wish we had a smaller workload that would allow us to do things other than exhibit numbers. Do you have any weight to the treating physicians at all? Yeah. He certainly discusses the treating physicians and discusses their findings. However, the treating physicians don't actually give any opinions to evaluate in this case. So as far as giving weight, I don't think there's anything to actually give weight to. We don't usually give weight unless there's actually an articulation of an opinion of some kind or something that we can reasonably call an opinion of functional limitations or ability to work. There's none of that here. What we have is just basically conservative treatment, him going in and getting some refills on medications, that kind of thing. On his conservative treatment, I thought that he was concerned about his – he lost a kidney and he was concerned about medication and whatnot. He says that. It seems reasonable. It does seem reasonable. It does seem reasonable. Absolutely. However, I think this is where Dr. Lee is important. There's a difference between we're trying to keep the medication down or we're trying to minimize its use versus it's precluded. It's clearly not medically precluded. He's on morphine at the time that we find him disabled. So the medical evidence indicates that once he did become bad enough, he was put on these narcotics. There are statements to the effect of, you know, we're trying to minimize or we'd like to keep this down. And I think that is a good point that Mr. Lindquist is not necessarily a completely typical individual because of the kidney disorder. However, in light of the subsequent evidence that he was eventually put on narcotics, that indicates that they are not precluded. It was more just a preference they were trying to follow. And when we consider all the other factors in combination with that, like the activities of daily living, I think that in combination we have substantial evidence supporting the credibility finding. Okay. Thank you, Cancel. If there's one more thing I could address with my time, just the point that was made about his allegation of disability beginning in 2008, that is simply factually incorrect. At no point did Mr. Lindquist allege that his disability began in 2008. He has consistently alleged a disability date in the 1990s. The ALJ only adjudicated from 2008 onwards because under our regulations, he's not eligible for benefits before then. That's an important distinction because as long as he maintains that he's been disabled since the 1990s, under a credibility evaluation, it's perfectly legitimate to look at activities during that time. However, once we get into more assessing limitations, the ALJ has to focus then on the 2008 period where he's actually eligible for benefits. I think that's just an important distinction I want to make. Okay. Thank you. Starting with that important distinction, no. An ALJ cannot evaluate a person about a time period prior to the time period that the ALJ says he's evaluating. The ALJ says he's evaluating beginning in December 2008. He can't, based on an incomplete record, say, well, I'm going to find him not credible because of these medications he's not taking 10 years ago when he may or may not have been taking the medications. We don't have it in the record. We don't have a record. That's completely improper reason to reject anything. You can't reject a person's credibility for that. You can't reject Dr. Schneider's opinion based on evidence that isn't in the record. The judge has to make his decision based on evidence that's in the record, and there isn't a record prior. A full record is a little tiny bit of evidence, but most of it's not there. The ALJ's RF, residual functional capacity assessment, which is on page 20 in his decision, here's what he says about mental limitations. He can get along with others. He can understand detailed instructions, concentrate and perform detailed tasks, respond and adapt to workplace changes and supervision, but in a limited public employee contact setting. That's the only limitation was this limited public employee contact setting. Everything else, out the window. Didn't accept any of it. Regarding medications, the government's attorney gave us two different stories here. One is that he wasn't on any medications. Wrong. His brief has a bunch of wrong things about that, too. And then he said, oh, well, his treating doctors were refilling the medications. What medications were they refilling? His pain medication. At the time that he saw Dr. Schneider, this is page 252 and 253 in the record, he was on hydrocodone and cyclobenzaprine, a narcotic pain medication and a muscle relaxer. He went off them at some point because he was worried about his kidney. At the time of his hearing, was he taking pain medication? Yes. He was taking gabapentin, which is for nerve pain. They were trying that to see if maybe it wouldn't affect his kidneys. That was one of his doctors had prescribed that to him. And that's what he was taking. So the entire argument, first from the ALJ, saying he's not taking medication, he's not taking pain medication, is false. And the government's defense of that is false. I shouldn't be standing here telling you that, but it's in my reply brief. With regard to diving in Puget Sound, there's also his testimony that when he'd get out, he would collapse in his car and go to sleep. And with regard to the lay statement about not traveling, they generally don't drive around. They don't go places. They go on a couple special trips. How often? That's not in the record, but it's not a common thing. And there is a basic rule that when you're disabled, it doesn't mean you have to crawl under a rock or go into a dark closet and never do anything ever again for your life. He's doing the best he can. Okay. We got it. Okay. Thank you. We appreciate your arguments, counsel. The matter is submitted.
judges: Paez, Bybee, Callahan